Teachers, et al., Appellates. Mr. Gleason for the Appellates, Mr. Shield for the Appellates. Just wait a second until your friends are all settled. Good morning. Good morning, Your Honor, and may it please the Court, my name is Anthony Gleason. I represent the Appellants, in this case, the Union. And it's Pilots, of course. Your Honor, we're here on an appeal from the grant of an injunction issued by Judge Moss last fall. We're here on appeal because we think that, and our point that we'd like to discuss with you today, is the trial court made, I think, several legal mistakes and misapplied very well-settled law in determining that it could indeed, it did indeed have even jurisdiction to grant such an injunction. And I'd like to discuss, we've, both sides have very extensively filed papers and argued this in a lot of papers, a lot of trees. But the thing I'd like to really focus on this morning, Your Honors, is to go back to Shoreline. Let's go back to the analysis that actually is required here to determine whether there was indeed a status quo violation in the first place. This is a case where, although the carriers actually identified or purported to identify dozens of examples of actual conduct, behavior, as they call, that violated what they call the status quo, they never really got around to defining in any discernible way what the status quo was. This isn't a case where the carriers conceded that there is no violation of the collective agreement. There was no, they didn't proceed on the basis that there was any violation at all of the collective agreement or even, therefore, best practices under that. They instead, at trial, they claimed that this is only an RLA Section 21st, therefore, implied status quo case. That does not negate or eliminate their obligation to point out to the court what precisely is the status quo that they're saying was changed. In this case, they hinged their status quo claim simply on claims of change in behavior. Behavior alone does not make a RLA practice or condition under the Shoreline decision. The Shoreline decision still requires that even in a case where you concede that there's no violation of a specific term in the collective agreement, you still have to find a practice or a working condition that's actual, and it has to be actual and objective conditions, such that they're deemed to be an implied term as if they're part of the collective agreement. To be a status, therefore, to be an RLA Section 6 status quo or practice, it has to be something, again, that's clear. It has to be something that's based upon and determined based upon mutuality, acquiescence. What's your sense, what's your argument with respect to the blockout? There are three things we're talking about. Yes. What is the, what are the contractual obligations? What are the legal obligations with respect to blocking out? The blocking out that's been referred to as the boot program, the company, we think it's, quite bluntly, we think it was an absurd claim even that that could ever constitute a status quo. Contractually, we have a responsibility to show up and work and report for duty and to fly our airplanes and to do that personal policy. Is there some sort of obligation somewhere that a pilot has, once ready, must leave even if it's before the time? No, not at all. The company made a bold claim that there is such a metric as loaded and ready. There's not at all any metric like that anywhere. In fact, to the contrary, in the company's policy manuals, they actually have a requirement that you cannot depart earlier than the estimated time of departure, any earlier than 15 minutes from that. And so Judge Moss even determined that it was a violation, determined that to the extent there was any behavioral activity pre-Section 6, they included even 25 minutes. It's not the appropriate analysis. There is no metric whatsoever, whether it be by these carriers or any other carrier that I'm aware of, that has a loaded and ready policy or procedure. And certainly in here, there is never ever any metric, certainly that could rise ever to the level of a status quo practice even, that there's such behavior could actually be enjoined now that we're in a Section 6 period. It's just not there. I'm not entirely sure what the injunction would do, for example, with respect to that. I'll ask the other side. In your view, what's being enjoined? If there's no requirement anywhere, contractual federal regs, as far as I know, the regs simply talk about leaving on time, as far as I recall, right? No, I agree with you, Your Honor. Federal regs don't say once you're ready, you can leave before on time. I'm not aware of any federal reg that says that. And the only metrics I am aware of, and I think it's also just by the regulatory authorities at specific airports, is, you know, when you get there, you have slot times, for instance, like that, when you can arrive and things like that. But the real metric has always been one of arrival time, are you late or not. This is not a slowdown case simply because we left less early than what they claim that we did previously to Section 6. What do you think the injunction requires the pilots to do with respect to blocking out? What does that mean? I'm sorry? What does that mean? I think, ironically, I guess the Congress would be true. We shouldn't block out on time. I mean, that's really how bizarre I think that entire claim was. Our behavior was that the pilots, they have discretion. It's part of their job, obviously, as pilots, licensed pilots, to have discretion to determine when it's safe, when it's appropriate, and when they are indeed ready to fly. But they're also subject to the restrictions of, you know, the 15-minute restriction, like I said before. But to say simply because they left, let's say, 20 minutes earlier than the Section 6, that now they're required to do it in every instance or risk contempt, now that there's an injunction issued, that's a worrisome prospect for my client and for my client's pilots. Well, accepting the overtime, you know, you put on some decent evidence to suggest there's a clear explanation as to why the pilots were unwilling, because what the company was offering had changed. The company's burden, not your burden, the company's burden to get the injunction to show that, in fact, there had been a change in the status quo with respect to overtime. Your claim is that what the company was offering was different, and therefore it's perfectly reasonable that what you saw from the pilots changed, and indeed it was inconsistent what you saw from the pilots. What do you think is their best case with respect to the overtime? I mean, it's clear to me what you put in, and I understand what you put in. What do you think is the best case that they're putting in with respect to changing status quo? I think the carrier's best case has always hinged upon the statistical analysis to simply determine what past behavior based upon circumstances that have indeed changed. But the statistical analysis, if I'm understanding you correctly, does not incorporate an understanding or an attempt to digest the change in what's being offered. That's correct, and I think that the use of statistical analysis in there was a mistake by the court. I mean, and I'll ask them the same thing. The raw numbers don't mean a thing if what the pilots are being offered is not the same as it was before. And indeed, am I right with respect to the overtime, that what you saw was actually fluctuating, and indeed there was one month, which was during a holiday period, the overtime acceptance rate was not down? Yeah, that's correct, Your Honor. It was actually statistical gymnastics is perhaps a generous way to, you know, from our perspective as to what took place here. The statistics that were used that certainly persuaded Judge Moss were not consistently even applied, and they frankly dealt with wholly new, made up specifically for this case, metrics. All right, so what they're trying to and what the trial judge was buying was the kind of ha-ha messages going between union leadership and members as if to suggest, you know, we've got some leverage here. And I'm really not sure what to do with it in my mind because I don't know that they're making out the case. But on the other hand, there are cases that say or seem to suggest when there are these ha-ha messages, you know, kind of give it to them, you know, then you're in a less good position than you would otherwise be. We can't run away from the communications that, you know, are in the record, Your Honor, and we don't. But we do think that those communications were taken clearly out of context and used for the wrong reason. Let me ask you that. I mean, you agree, don't you, that if there is evidence of a concerted effort, that the union orchestrated a concerted slowdown to create pressure on the ongoing negotiations, that that is a major dispute, if one can find it. That's what you're looking for, right? Well, Your Honor, I would have to nuance that one extra step. It would also have to be discernible, demonstrable harm. Wait, wait, wait, wait. Let me make sure we're joining this carefully. Sorry. What Judge Griffith asks you leaves out the inquiry about change in status quo. Yes. That's correct. Isn't that part of your answer? Yeah, I mean, and that's what I was going to say. You're saying you can be as concerted as you want it, but if there's no change in the status quo, there's no failure. Yeah, you still have to find, is there a status quo within the meaning of the RLA and the shoreline and its progeny? Was there a change in that status quo? So that's your answer to the ha-ha-ha. Yeah, I mean, frankly, that's part of the answer. Whatever, there's no change in the status quo. Yeah, yeah. Over time, it's an easy explanation. The, I don't know, the blocking out. I'll have to hear what the company is saying. That one is baffling to me. I don't know what that means. I don't know what the status quo is there. And on the sick leave, I don't know how you put it in a status quo if every single case that they're citing, there's an explanation for the person's absence. Which we demonstrated each and every instance, not just to the sick leave. Examples of what they called abuse as well as the fatigue. My understanding of your evidence is every absence or call in was explained, and the company's not contesting that it was legitimate. That's correct, Your Honor, and the company conceded that. I'll have to ask them, but your answer to Judge Griffith is it's not just a notion of concerted activity. There's got to be a change in the status quo. Yes, and there also has to still be, even if you get to that next point, the last step at the back end, if you will, there still has to be discernible harm. This case deals with, it pulls down to, if we plow through more than 140 pages of very detailed statistical analysis from the carrier's expert, it pulls down to what the carriers have described as on average 6 minutes and 18 seconds worth of departure delay. That's why we're here. What is wrong with the following sequence? Tell me where you get off the point. One, the union mounted a slowdown campaign and persistently directed or instructed or advised pilots to block out on the scheduled time, right? You don't dispute that? I do. I dispute the characterization that what took place was actually a slowdown. Okay. Well, there was a campaign and the union said that, right? There was an education. I'm sorry, Your Honor. The statistics that are cited say that before February 2016, nearly 80 percent of Atlas flights blocked out prior to their scheduled departure time. After February, only approximately 34 percent blocked out prior to their scheduled departure time. Do you see the connection? What is wrong? Where's the mistake in that? Well, the mistake is because I consider it to be, on behalf of my client as well, it's either Orwellian or Kafkaesque to say that we departed less early than we did previously. This is not a case where we left after even the estimated time of departure. This is a case where we left less early. It's the same as when they talk about in the communications of shop. It does remind me very much of Kafka or Orwell. How is it that I'm subject now to contempt with an injunction hanging over my client's head just simply because of an educational program that says that we should stop doing less for a company? That's not a status quo. I can't find a status quo within there. The injunction as to the union is simply stop advising the pilots to change the situation that existed before February 2016, isn't that it? No, I think that the danger that this decision stands, the danger is that any creative counsel and one with very creative statisticians can take our pre-Section 6 behavior, concerted behavior in enforcing and just doing our collective bargaining enforcement can be deemed to be obstructing in some way or another the carrier's operations. The aha, as Judge Edwards called it, is important in the district court's reasoning, and I think it starts. Let me just read to you one of the ahas. Atlas executives believe that if they can delay a new CBA long enough, you will lose your interest and your resolve and start violating the CBA, cutting corners and resigning yourself to the status quo and abandon the quest for an industry-leading CBA. Well, this cannot be allowed to be the case. You must shop, boot, and push back on all their tactics harder than ever as we are strengthening what we desire. That's a call to action, right? That was a call to action by the members. Now the question is, did they respond? And you're saying they didn't respond? They responded to a call to action to make sure to know your contract, enforce today's contract, not influence tomorrow's contract, but today's. We are starting to get the movement out of this company we desire. So what's the district court judge, who's the backfinder, what's he supposed to do with language like that? Disregard it? No, what we had asked him to do was we didn't run away from those communications. We didn't anyway because he should have taken the consideration of the context in which all of that arose. Those programs, those communications, dealt with something that had been agreed upon. Both parties knew as early as January of 2015, long before we filed the Section 6 notice, that dealt with what Captain Kirshner had called a bilateral policy of strict compliance on both sides because it dealt with the carrier or the union's concerns that the carrier was, frankly, running roughshod, continuing to violate, and specifically with respect to that quote, making special deals with our individual pilots. You're saying a call to action to do that which you're lawfully permitted to do and contractually permitted to do doesn't fit the legal prescription. In other words, there can be a call to action, you're saying, but on the blocking it's a call to action to do what is perfectly permissible because there's no rule that requires you to leave before the starting time. Is that your argument? Yes, Your Honor, that is correct. In a nutshell, that is correct. Is that also true with respect to last-minute sick calls? Yeah. I mean, last-minute sick call is something that was invented for this purpose of the litigation that they brought against this case. Again, there's no metric for a last-minute sick call, nor is there any communication even in this record or anywhere else that says that you must wait until the last second to call off sick. What was instead litigated at the beginning through its complaint was that the pilots had abused sick calls, period, and then they made up, they called it abuse, and they said then they waited until the last second. Well, the examples of abuse, as we discussed with Judge Edwards, were each and every one were refuted, and the company recognized and conceded that. So it was a made-up metric because they couldn't determine that, overall, a true sick leave abuse like we've seen in other cases just doesn't exist, statistically or otherwise, not even statistically in this case. So they had the jury, if you will, the jury rig, they had to kind of reverse engineer statistics to try to show a case that doesn't exist legally because there was no status quo. So we're reviewing the district court's injunction here, right? And the district court determined there was a link between the call to action and this conduct, right? And how are we to review that finding? It's a clear error, right? No, I don't because I think it has to go back to the abuse of discretion because of the misapplication of the shoreline. The judge's findings were based upon an incorrect application of the RLA and the shoreline and its progeny with respect to what is a status quo, and I think everything that flowed from that was an abuse of discretion. You're more or less acknowledging the judge's findings as saying, yeah, there may have been a link, but it's irrelevant because there's no change in the status quo. Yes, there may have been suggestions to the union. You know, under the law, federal regulations, and under the contract, you don't have to leave before departure time, and there's no company rule that says you do. So you're saying the call to action, yeah, the district court was right. Maybe there was a call to action, but so what is what you're arguing. I understand. Your Honor, that's correct, but I'm wrestling with trying to respond to Judge Griffith, and that has to do with the fact that Blink, Ture, they tried to influence the Section 6 negotiation as well. There is no link there. The link, the reason, if you will, behind that, dealt with trying to enforce today's collective agreement. There are so many repeated, the whole tapestry, a 19-month effort to put that case together before they dropped it on us in an emergency hearing, it was very cleverly done, but it also very cleverly concealed the fact that they didn't have a status quo to start with. That was only one of many problems. There were several others, as we point out in our papers, but the one other one, again, is at the back end of that analysis again. Even if you made both those connections, at the end of the day, there was no discernible harm. The term status quo, does the status quo under the Railway Labor Act take into account what we used to call the law of the shop? In other words, you go to any plant, any manufacturing facility, any service facility or whatever, and there's certain practices that grow up over time, and they're not spelled out in the collective bargaining agreement. There's tacit approval. Sometimes there's explicit approval, and eventually the law of the shop develops, almost like a common law. As a matter of fact, when I worked for General Motors, retired Justice Whitaker was the arbitrator or whatever, and there was all this common law in the factories and so on and so forth. Does the Railway Labor Act take that into account as status quo? It does, but the operative term in your question was certain past practices, not all past practices. I think this Court itself in Eastern Airlines pointed out, and as I believe the Eighth Circuit in the UTU case also pointed out, not every past practice actually rises to the level of becoming a well-established past practice within the meaning, frankly, both statutes, whether you're under the NLRA or whether you're under the RLA. And when we're here under the RLA and when we're dealing with Section 2 first, we're, again, not dealing with a claim of a specific term in the collective agreement, and that is where you're going, I believe, Your Honor, towards a past practice. If the practice or condition about which we're discussing is a well-established past practice, in other words, is it an objective, actual working condition that's measurable based upon mutual knowledge, consent, if you will, that could rise to the level of a past practice. You're saying the district court made no such finding. That's correct. I think that the district court incorrectly adopted. Didn't explain what the past practice was, because certainly a past practice could give rise. Yeah. Your argument is the district court never defined what the past practice was in the first place. Yeah, that's correct. To the extent that the district court, if you will, purported to define one, it was based upon such vague, it didn't meet the standard under Shoreline to determine whether it was a well-established practice, one that actually attaches to Section 2 first and to the status quo obligation under the statute. If the company had, during this period, introduced or announced, from here on in we have a policy that you have to block, you have to get out of the gates and gave a list of rules before the starting time. Here's when you should leave. You don't have discretion. You've got to do it. Is that a major or minor dispute? If they enacted a policy. As to when the pilots had to leave the gate. I'd have to follow that policy, and if I didn't, I think they would. Is that a major or minor dispute? It's new. It's never been there before. That's part of what you're arguing. There was no policy. There was not. How the company puts a policy in place. After Section 6? Excuse me? I'm sorry to interrupt you, Your Honor, but after or before Section 6? In the same time period in which we're talking about now. No, it wouldn't work because it's a new policy that it's changing, frankly, our discretion. I don't think that would work either. So you're saying that would be a major dispute? Yeah, because there would have been no status quo from which to measure it from pre-Section 6. In this case, the behavior is really what I think confused the trial court. The behavior alone, again, does not a past practice make within the meaning of this statute or the NLRA. And so, Your Honor, we have, again, I know I've really exceeded my time. I would still, if it's possible, like to reserve two minutes. That's up to the Court's discretion. One quick, one other point. Whatever, I know it's almost like stands out like a wholly different one, like a sore thumb, but I also have to tell you I believe very strongly that the Court misapplied the Norris-LaGuardia Act, Section 7E. And it did so based upon, frankly, a misreading of this Court's decision in the Green case, the 1941 decision. It's a case of, I believe Judge Edgerich was actually the judge in that one, in the Meeba case, the Crest-Tankers case, actually cites with authority. And the misapplication of the misreading of that statute was that, you know, there was a belief that actually there was a violence case that would therefore have triggered Section 7E. If you read the case more carefully, the 1941 decision from Green, and I think it's on page 53, you will find that the alleged violence that was being discussed there was violence that took place four years before the complainant even issued, you know, initiated that case. And the Meeba, the Crest-Tankers case, cites the Green case with authority. We're going to give you a couple minutes back. I'm sorry. Thank you, Your Honor. I appreciate it. Good morning. Good morning. Robert Siegel for Atlas Air. Let me, if I might, Your Honors, go right at this issue. First of all, the district court correctly determined that the union had issued a call to arms to slow down pilot behavior, to slow down and disrupt the operation in commerce for the purpose of imposing leverage during a major dispute over the negotiation of a collective bargaining agreement. The district court correctly determined that when a union issues a call to arms for pilots to change their behavior in a manner that slows down, disrupts commerce and operations for the purpose of impacting a major dispute, that is a violation of Section 2 First of the Railway Labor Act. Counsel, let me stop you here because it's not nuanced enough. I mean, I hear you, and it sounds impressive, but there's more to it. If there's a call to action to act within permissible lawful limits, and the call to action is to do something that's not inconsistent with a known status quo, I don't know how you get to where you want to get. You're ignoring the status quo question. And when I look at these, quite apart from the old-time question where I can't comprehend your case at all because the circumstances have changed. Your case seems ridiculous to me, to be very honest with you, on the overtime, because the circumstances completely changed. You can't measure them by raw numbers. But in any event, I don't understand your argument to go as far as it has to go to deal with they acted within permissible limits, there was nothing that they did that was inconsistent with contractual or legal limits, and there's nothing to show that what they did was inconsistent with the status quo. Your Honor, I disagree, if I might, please. First of all, the controlling authorities in this case are many over the last quarter century. These facts in this case are not unique. No, no, no. Tell me about the status quo. All right. I will, if I might, Your Honor. I want to reference the cases under Section 2 first, and then I'll discuss the second. Is the status quo relevant or not? Pardon me? Is the status quo relevant? What is relevant is the implied status quo under 2 first of the Railway Labor Act, if I might. That is different from Section 6 status quo discussed in the Shoreline case that Mr. Gleason just cited to you. Shoreline did not involve a slowdown and disruption of operations in violation of 2 first. The question there was whether an employer may change work assignments consistent with the Section 6 status quo against employers changing terms and conditions of employment without the Section 6 process. That's not our case. Our case is a different one. It does not involve Section 6 of the Railway Labor Act and the status quo there under. What it involves is Section 2 first of the Railway Labor Act. Section 2 first of the Railway Labor Act, according to the Supreme Court, has an implied status quo content to it, but it is not one of the status quo provisions in the Railway Labor Act. You've taken two minutes to agree with me that status quo is relevant. The status quo is relevant. If I might, Your Honor, I agree that the status quo under Section 2 first has been identified and has been described by the Seventh Circuit in two cases in the last few years. One is United v. IAM, and one is United v. ALPA. It's been described in great detail by the Eleventh Circuit in Delta v. ALPA. It's been decided in recent years in the District Court in Charlotte and in Fort Lauderdale recently where there was a refusal at Spirit Airlines for pilots to accept open time, and it caused 20,000 passengers to be grounded. And the court had no problem in saying all these courts have said the same thing consistently, that what you do is look at the point of whether or not there has been a change in pre-slowdown behavior, a change before the union issued its call to arms. That's what the status quo is. The courts have regularly looked to see if there has been a change in behavior that violates 2 first, which says you are to make and maintain agreements in a manner that avoids disruption to commerce and to operations arising out of any dispute. So the Seventh Circuit, the Eleventh Circuit, most recently the District Court in Fort Lauderdale. What was the status quo with respect to blocking? Okay, the status quo. And where did the District Court make a finding with respect to that? The status quo in that situation was demonstrated vividly by a chart offered by Dr. Lee, and Judge Moss actually adopted that chart in his decision. And what it showed is until the union issued a call to arms to stop doing what they had been doing, which was to leave when ready, there was what Dr. Lee called a statistically significant change in pilot behavior that he had not observed at such an extreme level in 25 years of testifying in cases like this. They were obeying the union, and the union threatened them if they would not obey. So you're saying the District Court found that as a matter of regular routine, pilots understood they had to leave when ready. As a matter of regular – I can't tell you what pilots understand in their minds. I can tell you as a matter of – I'm asking you to explain what your argument is on status quo. What the argument was – I'm sorry, Your Honor. I'm sorry. I'm trying to understand what your argument is on status quo. That pilots knew that they had – you're saying, I'm asking – they had to leave when ready, and they had no discretion is what you're saying. That's not what I'm saying. Okay. What I'm saying, Your Honor, is that the pilots demonstrably, on a statistically verified basis, left prior to estimated departure time at a marked level and a demonstrable level, and when the union issued its call to arms, the pilot behavior changed by a dramatic percentage, where all of a sudden, instead of normal practice, pre-slowdown, pre-call of arms, this has nothing – That's what I'm asking you. You're skipping around. What is the normal practice? The normal practice – That you will always leave when ready. Is that the normal practice? No, I didn't say always, Your Honor. I said that the statistics show that before the call of arms – What are the exceptions to always? It was not – Your Honor, it was not – See, the numbers don't make – if you want to play the numbers game, they don't make a lot of sense, unless you know what the exceptions were under the existing practice, to know whether or not those exceptions came into play here. So I don't understand the numbers. Well, first of all, with all respect, Judge Edwards, I'm not, in my view, playing the numbers game. I'm citing to you the kind of evidence that several courts, including the Seventh Circuit, Eleventh Circuit, have relied upon for the last quarter century to determine a change in pilot behavior. It is not grounded on a requirement in the contract about whether you go early or not. It is grounded on a – So let me put it this way. In the evidence in the record, the other side introduced evidence that among the things that they took into account were folks sitting in the cockpit, what their time requirements were, and whether leaving at a certain time would adversely affect them. Was that taken into account in the figures? Judge Moss found that to not be credible, and the reason – Which was not credible? That was not an accurate description? Your Honor, he found that the cause of the change in pilot behavior was exactly traced to the call in arms. The union didn't just ask. They directed pilots to stop shopping, stop helping out purchase, stop your normal behavior, to boot, which is to block out only on time. These were changes in behavior, Your Honor. This is the change in status quo that the courts – all courts have recognized under Section 2.1 of the Railway Labor Act, and it's demonstrable. The explanations offered at trial were rejected by the trial judge as not being credible, that the cause of the change – first of all, it's pretty plain. It all started with the call of arms. So the union says, this is what you must do, and by the way, we're going to put notice out that you're scabbed if you don't do what we say. And then they do one other thing, Judge Edwards. They say, and we want you to do this because we want you to bring the company to its knees at the negotiating table. No question that you have called to arms. So I understand your argument on blocking. Let's go to the overtime, which I don't understand at all. All right. If I might. This is a subject addressed by the Seventh Circuit in United v. Alpha. It's addressed by the Eleventh Circuit in Delta v. Alpha. It's addressed just recently in the district court in Fort Lauderdale in Spirit v. Alpha. Here's what they do. The airlines have a system whereby a certain percentage of their flights are covered by what they call open time flying. The unions like it. They bargain for it because they get premium pay. The airlines staff their operations accordingly. This is all discussed in the Eleventh Circuit opinion, and I recommend the decision to you. But what they say is you have a status quo that involves an arrangement whereby there's a normal pattern, not required pilot by pilot. The courts have addressed this, but there is a pattern by which a certain percentage of the flights are picked up. In those cases, did we have situations that were the same as the one here, which was the companies changed what they were offering in terms of overtime? I mean, the evidence is very strong here. You can't use the numbers to measure the two different scenarios. The unions' argument and evidence here is very compelling that the reason there was a drop. Let me tell you the two pieces of evidence that were at least compelling to me when I looked at them. The reason you had a drop, and it wasn't consistently a drop because it went down, came back up again, and then it wavered. So there was no consistent drop. But the problem was, starting out, what the company was offering in terms of overtime changed, and it was not desirable. Now, they aren't required to take bad overtime. They're not required to take any of it. So you can't say there's a change in the status quo when what these pilots were being offered changed. Well, Your Honor, with all due respect, that's a factual argument made at trial. Judge Moss found that the explanation offered by the union was not credible. He may be clearly erroneous because the evidence that was offered by the union – let me make sure we're together on this because this one left me cold. Judge Moss did not say, as I recall, that the union was wrong in saying that the offerings of overtime had changed. He did not say that. The other thing he did not say was that, indeed, the overtime figures went up and down. And in one month, which was a high-flying month, they did not go down. So I don't know what you end up with. Judge Moss did not side with you. He simply allotted the arguments that were made. Well, Your Honor, my perspective is on the issue of changing behavior on open-time flying. Judge Moss, first of all, used the same analysis that the 11th Circuit and the 7th Circuit used. It's irrelevant. It's not the same circumstances. Your Honor, again, with all respect, the union openly told the pilots to stop picking up open time in order to cause delay, disrupt operations, disrupt commerce, and to do so to bring the company to its knees and collect the bargaining. The problem is you have numbers that are completely inconsistent with that. Well, the statistical report, again, with all respect, Your Honor, Dr. Lee's report showed that there was a statistically significant change. He uses a standard deviation analysis. All the courts have accepted that as evidence of concerted action to change behavior in order to impose leverage in collective bargaining during a major dispute. Your Honor, if I can just say this from a practical matter as I have my dialogue with Your Honor. This is a real-world situation for the airlines. What we are talking about is whether or not an airline's operation and U.S. commerce can, under whatever arguments are being made here, be disrupted purposely and at the call of arms of a union so that the union can achieve what it thinks is leveraging collective bargaining. And the people who suffer, if the union is allowed to do that and to essentially ignore the restrictions of Section 2-1st of the Railway Labor Act, which requires it to make and maintain agreements without that kind of disruption, who suffers is, first of all, as Your Honor would well know, the public suffers. That's the whole purpose of Section 2-1st of the Railway Labor Act. I'm trying to understand the case. And on the overtime, I don't get it at all because the district court findings simply are not supported as far as I can see. The blocking, I hear what your argument is. Suppose this had happened and there was no call to arms on the blocking. That is, in fact, the numbers, as you say, went down. There was no call to arms. Union officials said nothing. Would the case be different? First of all, actually, the case law says the union, even if it doesn't instigate the slowdown, has an absolute obligation to take effective steps to stop it. So if it were instigated by a group, this is directly affirmed in the Seventh Circuit opinion. So you're saying if the facts in this case were blocking, there are no rules with regard to when you have to leave other than on time. The union has made no call to arms. They've instigated nothing. They've said nothing. They've called no action. But the numbers start changing. You could get an injunction? First of all, Your Honor, obviously that's not this case. But I am saying that the court — I understand it's not this case. It's hypothetical. Your Honor — Tell me, could you get an injunction? Two circuits have said yes because it is their interpretation of two firsts, that the union has, as the certified representative, an obligation to take effective steps to stop an illegal slowdown disrupting operations. I don't know what you mean by illegal. That's the problem when we keep going around. I have no requirement that you leave in a certain way. The company has no rules. The Federal Reg certainly don't require it. But the pilots have discretion. That's where your case is. There are no requirements. With all due respect, Judge Edwards, I think that is not the interpretation, that is not the rule that has developed over the last quarter century in the cases. They do not require that the behavior that we're focused on be required by a rule. That's just something being made up right now in this case. Your Honor, with all respect, I think it is important for the panel to understand that the issue here, including the open time issue, which has been addressed in all the other prior cases, does involve a situation where, in this case, the union was telling the pilots to change their pre-slowdown behavior and telling them exactly why. Okay, you made that point. What about on the last category? Before you get to that last category, would you clear something up for me with respect to the overtime? I guess the counterargument is that there was really no change. The Section 6 notice came in February of 2016, and there really was no change until September. But I don't know whether it's disputed that there was a change that occurred from September on, but the statistics indicate there was a dramatic change. So the only question was whether the union was responsible for that change, which is a factual question that Judge Moss resolved against the union and said, yes, they were responsible. Yes, that's correct, Your Honor. And when Judge Moss did that, he pointed out that when the Section 6 notice is served, it's not necessarily an automatic start button for all activity. The union intensified its communication plan when the Section 6 notice was served. And you watch the intensification of the communications, and then you watch the intensification of the impact on the operation and the change in pilot behavior. And he says there's no – he found, as a matter of credibility of the witnesses and the evidence, that there can be an intensification of the problem sometime after the Section 6 notice. In further answer to that question, I will have to go back and look at the numbers again. My recollection is it's an exaggeration to say there was a dramatic change in the overtime post-September. It went up and down and went back down again in November. It wasn't consistent. There was no straight line the wrong way. Doctor, you're just – you're not telling the truth about the figures. There was not a consistently dramatic change post-September. That's not correct. Well – It went up and down in November. They went the wrong way, inconsistent with your case. First of all, the changes were – I can't argue back and forth on the subject other than saying it was – Well, no, this is a factual determination. There was an expert – Wait, counsel, wait. This is an important fact. You said to Judge Randolph, right, there was a dramatic, consistent, dramatic change. That's not correct. That's what was demonstrated by Dr. Lee's expert report. What he does – he's a recognized expert on the airline industry and statistics, and he's a Ph.D. in economics. And what he does is a study. He, first of all, does a regression analysis to rule out other factors. And then he concludes on a standard deviation basis that there is, in fact, what he calls a statistically significant change in pilot behavior. And what did he say about the change in the offering? That is, the overtime that was being offered, it went down dramatically and it was different, right? Your Honor, you'll see in the opinion, he did a regression analysis to control for that factor and every other factor. The judge found his testimony to be credible. And so – and it was not rebutted at trial by anything offered by the union. Again, I'd like to stress that while – if I could, just to conclude, while we quibble over some of this, the question that is in front of us is, again, when the two parties are undoubtedly involved in what the courts have called a major dispute over the negotiation of a collective bargaining agreement, may a union do what this union did, which is to issue a call to arms telling pilots to change their behavior in order to disrupt commerce and operations for the purpose of bringing the carrier to its knees in collective bargaining? And under two firsts, Congress has said it may not do so. It may not take action in the making or maintaining of agreements designed to disrupt operation or commerce. Thank you very much. Let me ask you one thing, counsel. If the company – I'm going to ask you the same thing I asked the other side. If the company during this period had said there's a new policy on blocking, here's what you have to do. Is that a major or minor dispute? Well, that's – Your Honor, that's Shoreline, that's Conrail. That's a different situation. When the carrier purports to change and as a status quo and issue a new rule – And tell me if you think it's major or minor? No, it – well, Your Honor, under – first of all, it's not a black – if I can, please, I know the answer, which is when a carrier takes action to change a term of employment, it is either permitted by an implied or expressed term of the contract that's applicable, which is – Major or minor? Your Honor, it depends on what is in the collective bargaining agreement. Sometimes what employers do are permitted under the terms of Conrail, under the terms of a collective bargaining agreement. Conrail announces it's going to start a drug test, and the Supreme Court eventually says Conrail has an arguably justified reason for doing so. Go to arbitration. It might be a minor dispute. On the other hand, if Conrail's explanation were being frivolous, then it would be a major dispute. That's the test. It was discussed in Shoreline. It was discussed in Conrail by the Supreme Court. Does it matter under Section 2, first, whether it's major or minor? Well, that's an excellent question, Your Honor. In this case, it's been assumed that it should be a – that a two-firsts violation arises out of a major dispute. And in most cases, that's what happens because it occurs during collective bargaining. Right. But there are persuasive cases that have said even if the slowdown arises out of a minor dispute, even if it would still be a violation of two-firsts, there's an excellent discussion of that subject. In the Seventh Circuit opinion, United v. Alba, and if you look at the district court opinion, Judge Lefkow, her opinion was adopted by the Seventh Circuit. And she correctly said, actually, it doesn't matter. The union cannot do a call to arms and disrupt operations to try to pressure the carrier, whether it's a major dispute or a minor dispute. It's just that most cases come up in a major dispute. But two-firsts says make or maintain agreements without disruption, not just make. I would also recommend, Your Honor, the cases we cited in the Second Circuit and the Third Circuit, who agree with Judge Lefkow, and the Seventh Circuit. That's Long Island Railroad and SEPTA. In both those cases, they approved section two-firsts injunctions, even though there was an underlying minor dispute that was going to be sent to arbitration. Thank you very much. We have your argument. Mr. Gleason will give you back three minutes. Thank you, and I'll try not to use the entire three. I know I used it a substantial amount before. What I really wanted to come back up to discuss with Your Honors are the cases that Mr. Siegel cited. Sorry. The cases that Mr. Siegel cited, really, they came up in a different context than this. In the cases, the United cases, for instance, that was a Section 8 Norris LaGuardia Act clean hands case. It was a Section 8, the second prong as well, that, you know, was at the least restrictive means in order to affect the result that the courts were seeking. That's not a situation where there was a dispute as to what the status quo was. That's markedly different than what we have here. We've disputed quite vigorously that Judge Moss did not make findings of any section two-firsts status quo practice that arises that could be deemed to be the status quo. And so I would commend and then ask that Your Honors make sure I'm right. I think I am. I don't think that those cases arose within the context in which we're here today. Mr. Siegel, I know, was going down a path about major and minor disputes as well in terms of calls to arms and slowdowns and all that. I would also ask Your Honors to take a look at the Sixth Circuit's, what I call, I guess the circuit does too, the ABEX I case. That was, I would ask you to read that. That case arose not during the Section 6 period. There was a more recent decision. Oh, my goodness. It was, I think, decided Election Day a year, maybe two years ago, and also by Judge Black in Cincinnati, also within the Sixth Circuit, of course, dismissing claims of violations of a section two-firsts status quo. Again, I just think that one of the things that comes out of this discussion, this dialogue with Your Honors today is just how impermissible and inappropriate it is to hinge findings, clear proof findings, of union participation and calling to arms of a labor dispute on statistics. Unlike the Kettleman case, I don't say that statistics don't have any use. I don't think the Court has done that yet in the analysis. But unlike the other cases that Mr. Siegel cites, the statistics were designed to, if you will, to substantiate real hard evidence of violations. Now, again, the unfortunate situation here is we are fighting and disputing the existence even of a status quo to which they could enjoin. Elsewhere, that was just conceded. But to use statistics to try to prove not just clear proof union participation to get past Section 6 in the Ars Laguardia Act is very troublesome. This was a case where the statistics drove the entire analysis, and that was a misapplication of the law. Your Honors, unless you have any further questions, I would like to thank you, and I think you have your case. The case is submitted.
judges: Griffith, Edwards, Randolph